Robert J. Itri (State Bar No. 10938)
rji@gknet.com
Andrea L. Stone (State Bar No. 26520)
andrea.stone@gknet.com
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:   (602) 530-8000
Facsimile:   (602) 530-8500

Gregory M. Krakau (Admitted pro hac vice)
gkrakau@lpslaw.com
LELAND, PARACHINI, STEINBERG,
  MATZGER & MELNICK, LLP
199 Fremont Street – 21st Floor
San Francisco, California  94105
Telephone: (415) 957-1800
Facsimile: (415) 974-1520

Flynn P. Carey (State Bar No. 25399)
Flynn@mitchellsteincarey.com
MITCHELL STEIN CAREY, P.C.
1440 East Missouri Avenue, Suite C100
Phoenix, Arizona 85014
Telephone:   (602) 358-0294
Facsimile:   (602) 358-0291

*Attorneys for Defendant/Counterclaimant*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| ThermoLife International, LLC, | No. CV 11-01056-PHX-NVW |
| Plaintiff/Counterdefendant, | **GASPARI NUTRITION, INC.'S MOTION TO EXCLUDE SURVEY, REPORT AND TESTIMONY OF JAMES T. BERGER** |
| v. | |
| Gaspari Nutrition, Inc., | **[ORAL ARGUMENT REQUESTED]** |
| Defendant/Counterclaimant. | |

3543755v2/23397-0001

Defendant/Counterclaimant Gaspari Nutrition, Inc. ("GNI") moves to exclude the survey conducted by Plaintiff ThermoLife International, LLC's ("TLI") survey expert James T. Berger ("Berger"), and Berger's related report and testimony.

I.   **INTRODUCTION**

TLI brought this suit against GNI alleging that GNI made false statements about its own products in its advertising, and that those false statements caused harm to TLI.  In support of its allegations, TLI intends to rely on a consumer survey performed by Berger ("Berger Survey"), as outlined in the Expert Report of James T. Berger ("Berger Report") dated May 29, 2013, attached as Ex. 1.  The Berger Survey, however, is replete with methodological errors and fails to adhere to fundamental principles of survey research.  In particular, Berger (i) sought to survey the incorrect population, (ii) attempted, but failed, to validate the survey, (iii) provided misleading statements in his expert report, (iv) used inaccurate and prejudicial stimuli, (v) asked biased, ambiguous, leading and prejudicial questions, and (vi) drew unfounded conclusions.  *See* Response to Expert Report of James T. Berger by Survey Expert Kenneth Hollander ("Hollander Critique"), dated June 17, 2013, attached as Ex. 2.[1]  Any one of these defects, standing alone, would fatally undermine Berger's conclusions.  Taken together they render the Berger Survey so fundamentally flawed that it must be excluded under Fed. R. Evid. 702.[2]

Moreover, because the Berger Survey contains numerous inaccurate statements masquerading as fact, and otherwise does not adhere to the fundamental principles of survey research, admission would severely prejudice GNI and would lead to unnecessary

---

[1] Berger was also engaged by TLI to critique the consumer survey conducted by GNI's market research expert Kenneth A. Hollander ("Hollander").  Notably, Berger was unable to identify even a single flaw in the survey design or methodology employed by Hollander.  *See* James T. Berger's Evaluation of Expert Report of Kenneth Hollander, attached as Ex. 3.  Thus, instead of critiquing the Hollander Report, he simply claims, without support, that he and Hollander conducted similar surveys and reached the same result.  *Id.*, ¶¶ 8-9.  Nothing could be further from the truth.

[2] In an effort to cure the fundamental flaws in his methodologies and opinions, Berger submitted a Supplemental Report a mere two days before the deadline for *Daubert* and summary judgment briefing.  This belated and highly prejudicial effort to avert the exclusion of his survey and report is the subject of a separate motion to strike.

jury confusion.  As a result, the Berger Survey must also be excluded pursuant to Fed. R. Evid. 403.

## II.     THE STANDARD FOR ADMISSIBILITY OF SCIENTIFIC EVIDENCE AND TESTIMONY

Federal Rule of Evidence 702 ("Rule 702") provides that an expert witness may provide testimony where "the testimony is the product of reliable principles and methods." FED. R. EVID. 702.  District courts must play an essential "gatekeeping" function to ensure that the requirements of Rule 702 are met.  *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993).  Indeed, under Rule 702, a trial court is "both authorized and *obligated* to scrutinize carefully the reasoning and methodology" underlying expert testimony.  *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 501 (9th Cir. 1994) (emphasis added).

The Federal Judicial Center's *Manual for Complex Litigation* provides a list of factors a court should consider when assessing the validity of a consumer survey:

- The population was properly chosen and defined;
- The sample chosen was representative of that population;
- The data gathered were accurately reported;
- The data were analyzed in accordance with accepted statistical principles;
- Whether the questions asked were clear and not leading;
- Whether the survey was conducted by qualified persons following proper interview procedures; and
- Whether the process was conducted so as to ensure objectivity.

MANUAL FOR COMPLEX LITIGATION (FOURTH), §11.493 (2004).[3]

---

[3] The Federal Judicial Center has also published the *Reference Manual on Scientific Evidence*, of which an entire chapter is dedicated to survey evidence.  *See* Shari Seidman Diamond, *Reference Guide on Survey Research,* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 359 (Fed. Jud. Ctr. 3d ed. 2011) (hereinafter "Diamond"), attached as Ex. 4.  Many in the field, including both Berger and Hollander, view Diamond as the preeminent authority on survey research for the purpose of litigation.  *See* Expert Report of Kenneth Hollander ("Hollander Report"), dated May 7, 2013, attached as Ex. 5 (Diamond cited

In the Ninth Circuit "surveys are to be admitted as long as they are conducted according to accepted principles and are relevant." *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997). Challenges to survey methodology often go to the weight given the survey, not its admissibility. *Id.* But this rule does ***not*** relieve plaintiff of its burden to demonstrate that its survey was conducted according to generally accepted principles. In *Click Billiards*, *Inc. v. Sixshooters Inc.*, the Ninth Circuit summarized the two-step process that governs the treatment of survey evidence:

> First, is the survey admissible? That is, is there a proper foundation of admissibility, and is it relevant and conducted according to accepted principles? This threshold question may be determined by the judge. Once a survey is admitted, however, follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility. These are issues for a jury or, in a bench trial, the judge.

251 F.3d 1252, 1263 (9th Cir. 2001); *see also* J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:158 (4th ed. 2013) (citing *Click Billiards*). Unless survey research is conducted according to accepted principles, it is not admissible in the first instance. *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgm't, Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010); *see also Icon Enterprises Intern., Inc. v. American Products Co.,* 2004 WL 5644805, *22 (C.D. Cal. Oct. 7, 2004) ("serious flaws in a survey will make any reliance on that survey unreasonable") (citing *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 488 (5th Cir. 2004)).

Recognizing its responsibility under Rule 702, the Ninth Circuit has excluded surveys that were not conducted according to accepted principles. *See, e.g., Lanphere Enters., Inc. v. Jiffy Lube Int'l Inc.*, 138 Fed. Appx. 20, 23-24 (9th Cir. 2005) (consumer surveys and related expert report were properly excluded as only marginally relevant); *M2 Software, Inc. v. Madacy Ent.,* 421 F.3d 1073, 1087 (9th Cir. 2005) (court properly

---

throughout); *and see* Transcript of Deposition of James T. Berger, August 7, 2013 ("Berger Depo"), Ex. 6, at 38:10-39:10 and 240:14-21.

3543755v2/23397-0001                    3

rejected survey because the survey's creator did not qualify as an expert). Numerous other district and appellate courts have also excluded consumer surveys that were based on failure to follow generally accepted principles and reached fundamentally flawed conclusions.[4]

In fact, multiple courts have excluded surveys conducted by Berger based on fatal flaws very similar to those that doom this Berger Survey. *See, e.g., Native Am. Arts, Inc. v. Bud K World Wide, Inc.*, 2012 WL 1833877, *8 (M.D. Ga. May 18, 2012) ("Berger's survey and his testimony relating to the survey are unreliable and unhelpful. Exclusion of Berger's survey and expert report, as well as his testimony relating to the survey is warranted under both *Daubert* and Rule 403."); *Vista Food Exchange, Inc. v. Vistar Corp.*, 2005 WL 2371958, *7 (E.D.N.Y. Sept. 27, 2005) ("[T]he Court finds that the survey conducted by Berger is flawed to the point that its probative value is substantially outweighed by the survey's potential for unfair prejudice and confusion.").[5]

---

[4] *See, e.g., Citizens Fin. Group, Inc. v. Citizens Nat'l Bank,* 383 F.3d 110, 120-21 (3d Cir. 2004) (affirming exclusion of customer confusion survey pursuant to Rules 702 and 403 where survey "did not suffer from mere technical flaws, but from fatal flaws" because it used an improper sampling universe); *Starter Corp. v. Converse, Inc.*, 170 F.3d 286 (2d Cir. 1999) (It was proper for district court to exclude a survey from evidence before the jury because the survey questions were irrelevant: "[A]ny probative value of the survey was outweighed by its potential to confuse the issues in the case."); *Vail Assocs., Inc. v. Vend-Tel-Co., Ltd.*, 516 F.3d 853, 864 n.8 (10th Cir. 2008) (Survey evidence was properly excluded as not sufficiently reliable to be admissible because it suffered from systematic design flaws and failed to comply with generally accepted survey principles.); *Malletier v. Donney & Bourke, Inc.*, 525 F. Supp. 2d 558 (S.D.N.Y. 2007) (excluding consumer confusion studies under Rules 702 and 403 based on the cumulative effect of multiple methodological errors); *THOIP v. Walt Disney Co.*, 788 F.Supp.2d 168 (S.D.N.Y. 2011) (same); *Hodgdon Power Co. v. Alliant Techsys., Inc.*, 512 F.Supp.2d 1178, 1181 (D. Kan. 2007) ("[W]hen deficiencies are so substantial as to render the survey's conclusions untrustworthy, a court should exclude the survey from evidence.").

[5] In numerous other cases, courts have found that Berger's surveys were so flawed that they were accorded little, if any, weight. *See, e.g., Lovely Skin, Inc. v. Ishtar Skin Care Prods., LLC*, 2012 WL 4711917, *12, n.5 (D. Neb. Oct. 3, 2012) ("the Court finds that Mr. Berger's survey is irrelevant to any issue in the case"); *Powerhouse Marks, LLC v. Chi Hsin Impex, Inc.*, 2006 WL 20523 (E.D. Mich. Jan. 4, 2006) (numerous deficiencies caused the court to "accord [the Berger survey] little weight in evaluating the pending motions [for summary judgment]."); *Univ. of Kansas v. Sinks*, 2008 WL 755065, *6 (D.

Like his surveys in those cases, the Berger Survey falls far short of meeting Rule 702's requirements. The Berger Survey is so riddled with errors that its conclusions are entirely unreliable. *See* Hollander Critique at ¶ 92. Indeed, virtually every aspect of Berger's work violated the basic principles of survey research.[6] Perhaps most notably, this Berger Survey is based on respondent information that Berger himself admitted is "obviously bogus."[7] This is a fatal error – one that undermines every other facet of the survey. The Berger Survey, Berger Report and related testimony must be excluded.

### III. THE BERGER SURVEY IS INADMISSIBLE UNDER *DAUBERT*

Under Ninth Circuit law, a survey is admissible under *Daubert* and Rule 702 only when it is "conducted according to accepted principles." *Click Billiards*, *Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001).

**A. Berger's Sample is Entirely Unreliable**

Scientific integrity and reliability are fundamental tenets of survey research. *See* Berger & Halligan, Ex. 7, at *vii* ("It is mandatory that the survey uses and respects the basic rules of scientific research."). The Berger Survey fails at every turn.

*i. Berger Sought to Survey the Wrong Population*

The first step in designing a survey is determining the proper population to be sampled. *See* Diamond, Ex. 4, at 376. Here, Berger sought to determine if statements made by GNI are likely to change consumer buying behavior, and how individuals are likely to react when they discover GNI's advertising is false. Berger Report, Ex. 1, at 2. The advertisements at issue here are directed to potential consumers, *i.e.*, consumers of

---

Kan. Mar. 19, 2008) ("[T]he Court agrees that the [Berger] survey results are suspect because they do not accurately account for the marketplace conditions under which consumers encounter [the product]," and "there are significant flaws in the methodology of this survey").

[6] Berger's work in this case violates even the principles Berger himself set forth in a text he authored with R. Mark Halligan in 2011. JAMES T. BERGER & R MARK HALLIGAN, TRADEMARK SURVEYS: A LITIGATOR'S GUIDE (Oxford University Press 2012) (2011) (hereinafter "Berger & Halligan"), relevant portions attached as Ex. 7.

[7] BER000010, attached as Ex. 8; *and* Berger Depo, Ex. 6, at 65:6-10, 70:4-8, and 78:4-13.

testosterone boosting supplements.[8]  But instead of surveying consumers of testosterone boosting supplements, Berger surveyed only former GNI customers.  By focusing exclusively on *former* customers (without regard to whether those customers are also *current* GNI customers), Berger introduced significant bias.  For example, respondents may have ceased using GNI products for reasons unrelated to those at issue in this lawsuit.  And respondents may have unfavorable impressions of GNI for reasons entirely unrelated to the issues in this case.  In short, by specifically seeking out former customers, Berger selected the demographic *most likely* to possess a bias against GNI.

Under other circumstances, the Ninth Circuit has held that errors related to survey population (particularly over-inclusiveness and under-inclusiveness) go to the weight of the survey and not its admissibility.  *See, e.g., Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609 (9th Cir. 1989) (survey universe was under-inclusive).  Here, Berger's population is far worse than under-inclusive.  It introduces significant bias, and therefore undercuts the reliability of Berger's conclusions.[9]

### ii. Berger Cannot Explain Participant Selection and Inaccurately Describes His Participant Selection in His Expert Report

The next step – a critical step – is selecting a survey sample that accurately represents the population.  Diamond, Ex. 4, at 380.  Paragraph 9 of Berger's Report describes his research design as follows:

> This survey was administered over the Internet.  Precision Research, Inc., my research coordinator, used Critical Mix, formerly known as Authentic Response.to [sic] develop the respondent panel.  Founded in 1998, Authentic Response has led the market research industry with high-quality solutions for global online sampling, including the development of ***its patented Double Opt-In permission standards***.  Its ***Authentic Recruitment<sup>TM</sup> panelist sourcing technique*** and its ***Authentic Validation<sup>TM</sup> process which ensures legitimate survey responses***

---

[8] Berger testified that the Berger Survey related only to Novedex XT, Halodrol MT, Halodrol Liquigels.  Berger Depo, Ex. 6, at 36:5-13.

[9] Notably, in an email to TLI's counsel, attached as Ex. 9, page BER000109, Berger proposed surveying all users of testosterone boosting supplements.  Nonetheless, he decided to take a different and biased approach.

3543755v2/23397-0001                         6

> ***are of the very highest quality***.  Due to the complexity of seeking out former users of the Gaspari products in question, Authentic Response brought on an outside source, Branded Research.  This company has been a long-standing trusted partner to Authentic Research.

Berger Report, Ex. 1, at 7 (emphasis added).  But when asked about the respective roles of these companies during deposition, Berger couldn't describe the roles and responsibilities of the various companies acting on his behalf.

> Q: Which company developed your respondent panel?
>
> A: Authentic and the other company they use, their subcontractor, Trusted or somebody they call them.  I don't know.

Berger Depo, Ex. 6, at 74:24-75:3.

> Q: Did you ask the panel company how they obtained the sample that was used for the survey?
>
> A: No.

Berger Depo, Ex. 6, at 237:19-21.

> Q: So if we wanted information about how this respondent panel was put together, we would need to speak with someone at Branded Research?
>
> A: Yes.

Berger Depo, Ex. 6, at 76:5-8. When asked about the Double Opt-In permission standards referenced in the Berger Report, Berger replied "I really don't understand what that means to tell you the truth."  Berger Depo, Ex. 6, at 62:6-9.  Clearly, Berger has not satisfied his burden of demonstrating that his survey was conducted according to generally accepted principles.  McCarthy, §32:181 ("the party offering a survey has a burden of laying a foundation that the survey was conducted in accordance with accepted principles of survey research.") and §32:181.50 (the expert's report should describe in detail the method of selecting respondents, among other things).

But perhaps even more concerning than Berger's lack of knowledge about his own survey is the highly misleading nature of his report.  Berger's description of his survey design specifically touts the "Double Opt-In permission standards," "Authentic

Recruitment™ panelist sourcing technique" and "Authentic Validation™ process" employed by the companies acting on his behalf in connection with this survey. Berger Report, Ex. 1, at 7. By including discussion of these protocols in his expert report, Berger clearly implies that the protocols were used in connection with this survey. But when questioned about the use of these techniques, he either admitted that the techniques were *not* used, or he claimed not to know whether they were used. Specifically, when asked about Authentic Validation, Berger simply stated "I didn't use Authentic Validation." Berger Depo, Ex. 6, at 245:19-246:1. When asked whether the Double Opt-In permission standards were used in connection with this survey, Berger testified "I don't know for sure." *Id.*, at 245:10-18. Likewise, when asked whether his survey used Authentic Recruitment, Berger testified "I don't know for sure…." *Id.*, at 246:2-20.

Berger's misleading description of his own survey design is clearly intended to impart credibility to his survey where none is warranted. His willingness to misrepresent these facts in his expert report evidences a lack of scientific integrity and candor to this Court.

### iii. *Attempt to Validate Demonstrates that Results are Unreliable*

Validation is another critical step in survey research. Berger & Halligan, Ex. 7, at 55 ("Once the survey has been completed, a final step in the process is to make sure the research vendors have provided valid information."). Validation is done to ensure the integrity and reliability of the survey research.[10]

---

[10] *See* McCarthy § 32:170 ("A validation check determines whether interviews were conducted, whether respondents qualified for the interview and, in some instances, whether the interviews were conducted in the proper manner."). Among survey researchers, validation of 10-25% of survey respondents is generally deemed sufficient. Diamond, Ex. 4, at 412; *and* Hollander Depo, Ex. 10, at 80:3-85:24. However, according to Diamond, "[w]hen a survey is conducted at the request of a party for litigation rather than in the normal course of business, a heightened standard for validation checks may be appropriate." Diamond, Ex. 4, at 412. Recognizing the importance of validation, Berger referenced the Authentic Validation process in his report. He specifically stated that validation "ensures legitimate survey responses are of the very highest quality." As discussed *supra*, he later testified that the Authentic Validation process actually was not used in connection with this survey.

1        Here, the Berger Report includes absolutely no discussion of validation.
2   Documents later obtained in discovery indicate why: Berger attempted to validate the
3   survey results and failed to do so. Berger sent the following correspondence to Ms. Lori
4   Tomoleoni, his contact at Precision Research:

> Lori --
> Spoke to the client and we decided to do away with the Validation Report. If asked in a deposition, I'll say that so many of those that provided their names were so obviously bogus that it made no sense to try to validate. What I need is a detailed description of how we acquired the names.
> Thanks,
> Jim

*See* BER000010, Ex. 8. Notably, despite specifically asking Ms. Tomoleoni for "a detailed description of how we acquired the names," during deposition Mr. Berger was unable to explain how the names of his respondents were acquired. Berger even testified that if we want information about how this respondent panel was put together, we would need to speak with someone at Branded Research. Berger Depo, Ex. 6, at 76:5-8. Moreover, this email correspondence clearly demonstrates that Berger questions the validity and reliability of his results. During deposition, Berger stated:

> I'll tell you exactly what happened in that case. I was putting everything together and, when I put all of my materials together, one of the things that I use is a validation report. And I asked Lori. I said, "Lori, what's the status of the validation report?" She said, "The validation report is no good." I said, "What do you mean by that?" And, she said, "Well, it was obviously a bogus list and people didn't take it seriously and the numbers just didn't look good."

Berger Depo, Ex. 6, at 79:4-13. He explained: "[a]s it turned out, the names and phone numbers that they gave were, to a great degree, very bogus. They were not real. They were not authentic. They said things like Donald Duck and Mickey Mouse and they gave phone numbers like 555-5555." *Id.*, at 65:6-10. He further testified "[i]t was quite obviously bogus and quite obviously the people who gave their names were not taking the

1   survey seriously at all." Berger Depo, Ex. 6, at 70:4-8.

2       In his book, Berger states that if validation identifies unqualified surveys, "those
3   unqualified surveys would have to be eliminated." Berger & Halligan, Ex. 7, p. 69. But
4   Berger didn't take that approach here. Instead he did just the opposite: he provided an
5   expert report (which made absolutely no mention of the "bogus" responses or the failed
6   validation), drawing multiple very broad conclusions based on this information he knew
7   to be unreliable.[11]

8       In contrast, GNI's own survey expert, Hollander, validated 100% of his survey
9   responses. Hollander Report, Ex. 5, at ¶ 48; *and* Hollander Depo, Ex. 10, at 160:15-23.
10   During deposition Hollander testified that "it is incumbent upon a survey expert to make a
11   good faith effort to verify or validate his or her survey responses." Hollander Depo at
12   160:17-19. When asked whether he has ever submitted an expert report regarding a
13   survey that was based on what he thought might be an unreliable pool of respondents,
14   Hollander responded: "My goodness, no." He went on to testify that he would never do
15   so "[b]ecause it wouldn't be probative, and it wouldn't be honest, and it wouldn't be
16   professional." Hollander Depo, Ex. 10, at 160:15-161:9.

17       Taken separately, Berger's (i) lack of knowledge about the selection of his
18   respondents, (ii) the highly misleading description in his expert report, (iii) his failed
19   attempt to validate the survey, and (iv) failure to mention the failed validation attempt in
20   his expert report, clearly suggest that the data gathered by Berger is unreliable. Taken
21   together, they demonstrate that this survey is nothing more than one party's attempt to
22   generate evidence favorable to it, conducted with blatant disregard for the accepted
23   principles of survey research. This is precisely the type of unreliable evidence that the
24   Supreme Court has instructed trial courts to exclude. *Daubert*, at 590 ("[T]he trial judge
25   must ensure that any and all scientific evidence is not only relevant, but reliable.").

---

[11] Further, Berger did not produce a single document related to the failed attempt to validate the survey.

### B. The Survey Berger Provided to His "Bogus" Sample Failed to Follow Generally Accepted Principles of Survey Research

Berger's survey respondents fall into four distinct categories – past consumers of GNI's Novedex XT, past consumers of GNI's Halodrol MT, past consumers of GNI's Halodrol Liquigels and past consumers of "any other testosterone boosting supplement."[12] Each category of respondents was provided a unique survey questionnaire.

#### i. Improper Stimuli

The Berger Report describes the survey design as follows:

> [Respondents] were shown documented unfavorable information about each of the Gaspari products. They were asked if they were aware of this negative information and/pr [sic] if not how would they react in terms of future usage.

Berger Report, Ex. 1, at 8. Berger purportedly sought to test how consumers would react to information contained in voluntary recall notices published on the FDA website.[13] *See* Recall Notice, attached as Exhibit 11. But the stimulus provided to three of the four survey cells was biased and misleading.[14] In each case, the stimulus presented to survey respondents was a paragraph of text paraphrasing the recall notices in a manner that is biased and self-serving to plaintiff.

#### a. Survey 1 – Novedex XT

The paragraph of text (also called a stimulus) provided to respondents in Survey 1, regarding Novedex XT, states as follows:

---

[12] During deposition, Berger was unable to determine whether the past consumers of "other testosterone boosting supplements" were also required to purchase one of the three Gaspari products in order to qualify for the survey. Berger Depo, Ex. 6, 91:3-92:15. Further, Berger misspelled Halodrol as "Haladrol" throughout Surveys 2 and 3 (screening questionnaire, stimulus and survey questions) introducing further ambiguity.
[13] Because this is a false advertising case, Berger clearly should have tested the advertisements themselves. But he did not do so. Given space limitations, this motion addresses the flaws contained in the stimulus Berger chose to present.
[14] The fourth cell, directed to consumers of "other" testosterone boosting supplements, did not include any stimulus.

3543755v2/23397-0001                                11

> On October 7, 2010, Gaspari issued a press release that announced the recall of the [sic] Novedex XT. In the release, Gaspari acknowledged the many potential adverse reactions that individuals may suffer after consuming Novedex XT including: (1) decreased rate of bone maturation and growth; [sic] decreased sperm production; (3) infertility; (4) aggressive behavior; (5) adrenal insufficiency; (6) kidney failure and (7) liver dysfunction.

Berger Report, Exhibit B, p. 3. This stimulus fails to fairly convey the information contained in the recall notice. First, the recall notice explains that a particular anti-aromatase compound is the subject of industry-wide FDA scrutiny, and provides a list of potential adverse events associated with the use of anti-aromatases in an at-risk population group (not the target consumers of GNI's products).[15] *See* Recall Notice, Ex. 11. In contrast, the stimulus provided to survey respondents attributes adverse events specifically to the product at issue in this lawsuit. Second, the recall notice states: "Gaspari has received no serious adverse events in over five years of marketing Novedex XT." *Id.* The stimulus provided to survey respondents omits that information altogether. Third, the recall notice clearly states that the recall was voluntary. *Id.* The stimulus provided to survey respondents omits the voluntary nature of the recall.

Berger has paraphrased the relevant information in a manner that changes the meaning and potential impact of the information on consumers. To the extent Berger sought to test a consumer's response to the information contained in the Novedex XT recall notice, the <u>only</u> proper stimulus would have been the recall notice itself. *See American Footwear Corp. v. General Footwear Co. Ltd.,* 609 F.2d 655, 660 n. 4 (2d Cir.1979) (upholding district court decision to exclude survey "for failure to conduct it under actual marketing conditions"); *Scotts Co. v. United Industries Corp.*, 315 F.3d 264 (4th Cir. 2002) (it is improper to show interviewees only part of a package in a false advertising case where the issue is consumer reaction to the advertisement as a whole and in context).

---

[15] The FDA's Safety Alert further clarifies that the FDA's concern was with regard to the use of anti-aromatases in an at-risk population. See BER000564, attached as Ex. 12.

### b. Surveys 2 and 3 – Halodrol Liquigels and Halodrol MT

The stimulus provided to respondents in Surveys 2 and 3 is equally biased and misleading. *See* Berger Report, Ex. 1, at Exhibit B, pp. 7, 9. It purports to be a summary of a press release issued by MuscleMaster.com with regard to Gaspari's Novedex XT and Halodrol Liquigels products. *See* Press Release, Ex. 13. When used in connection with Survey 2 (provided to respondents who had previously purchased Halodrol Liquigels), this stimulus suffers defects similar to those discussed above. For example, the press release provides that MuscleMaster.com has not received any complaints of illness or injury regarding these products. It further provides that the recall should not be construed as an admission that these products are not in compliance with the law. *Id.* The stimulus provided to survey respondents conveniently omits these important facts.

The same stimulus was also provided to respondents in Survey 3, directed to individuals who had previously purchased GNI's Halodrol MT product. *See* Berger Report, Ex. 1, at Exhibit B, p. 9. But neither the stimulus nor the underlying press release even mentions Halodrol MT. Accordingly, this stimulus provides the respondents with absolutely no useful information, and instead, serves only to introduce confusion and significantly prejudice GNI.

Notably, a district court in Georgia recently excluded another one of Berger's surveys based, in part, on similar error. *See Native Am. Arts,* 2012 WL 1833877, at *6-7. In *Native American Arts*, Berger presented the respondents of his consumer confusion survey with excerpts from defendant's website related to the litigated products. By displaying only portions of the website, Berger omitted "a plethora of additional information" that the consumer may encounter in the real world. The court stated "[a]n image from a website cannot meaningfully test for confusion if it is not presented in the way that an Internet user would actually encounter it." *Id.* at *7 (internal citations omitted). The court found "that Berger's failure to present the complete manner in which Defendant displays, offers to sell, or sells its goods renders the survey unreliable under Rule 702 and misleading and confusing under Rule 403." *Id.*; *see also Vista Food*, 2005

1  WL 2371958, at *5 (Berger survey excluded at least in part because the brochure he
2  provided to respondents focused on only a portion of relevant information, did not
3  replicate actual market conditions, and therefore skewed results in favor of Berger's
4  client).

5      At a minimum, Berger has repeated his *Native American Arts* and *Vista Food*
6  errors here. If he sought to test a consumer's response to the information contained in the
7  voluntary recall notice posted by the FDA, the only complete and proper stimulus is the
8  voluntary recall notice itself. With regard to Survey 3, for Halodrol MT, the stimulus
9  (which doesn't discuss Halodrol MT) serves no purpose other than to bias respondents
10 against GNI.

            ii.  *Questions Posed to Respondents Were Fraught with Bias and Ambiguity*

12      As every trial lawyer knows, the phrasing of a question often influences a
13 respondents' answer. This skillful use of language is applauded in the courtroom. But in
14 survey research, like all scientific research, any deliberate attempt to manipulate outcome
15 is unacceptable. *See, e.g.,* McCarthy § 32:196 ("[T]here is no real excuse for a biased
16 survey which attempts to measure buyer reaction by means of leading or irrelevant
17 questions asked in an environment far removed from the marketplace."). It is imperative
18 that survey researchers take all possible steps to construct survey questions that are clear
19 and not leading, and to impart objectivity whenever possible. *See* MANUAL FOR COMPLEX
20 LITIGATION §11.493; *and see American Foot Wear Corp. v. General Footwear Co.*, 609
21 F.2d 655, n.4 (2d Cir. 1979) (trial court properly excluded survey which contained self-
22 serving questions); *Sears, Roebuck & Co. v. Menard, Inc.*, No. 01-C-9843, 2003 U.S.
23 Dist. LEXIS 951, at *10 (N.D. Ill. Jan. 24, 2003) (excluding customer confusion survey
24 pursuant to Rule 702 in part because survey asked improperly leading questions). Here,
25 both the screening questionnaire and the survey questionnaires are replete with bias and
26 ambiguity.[16] The questions that make up the Berger Survey are ambiguous, leading,

---

[16] There are numerous other flaws not addressed in this Motion due to the 17 page limit, and respect for the limited resources of the Court. But a few of the most egregious examples deserve mention, albeit brief. For example, Berger's screening questions

biased, compound and prejudicial. Not a single question in the Berger Survey reflects what is generally acceptable in the field of survey research. *See* Overview of Berger Survey Questions, Exhibit 14.

The Middle District of Georgia recently excluded a survey conducted by Berger on grounds that his questions were both leading and ambiguous. *Native Am. Arts,* 2012 WL 1833877, at *8 ("The Court agrees with Defendant that the question regarding the products is leading and slanted. It implies the answer to the ultimate question the survey was designed to test, which is improper. … In addition to the leading nature of the question, the Court believes the question regarding the products is ambiguous, requiring the exclusion of the survey."). The same result is warranted here.[17]

---

introduce significant bias by disclosing the purpose of the survey. Double-blind research is standard in surveys conducted for the purpose of litigation to ensure objectivity. Diamond, Ex. 4, at 410-11. "The survey instrument should provide no explicit or implicit clues about the sponsorship of the survey or the expected responses." *Id.,* at 411. Specifically, "[t]he screening questions must be drafted so that they do not … convey information that will influence the respondents' answers on the main survey." *Id.,* at 387. Berger specifically disclosed information about GNI in each phase of the survey. He expressly made respondents aware of the purpose of the survey – to gain information about GNI and its products. He easily could have conducted his survey blindly by framing the questions to test the alleged false claims without attributing them to GNI. *See* Hollander Depo, Ex. 10, at 124:1-126:12; Berger Depo, Ex. 6, at 169:4-22. But Berger chose not to do so. As a consequence, his results lack credibility.

[17] Berger also failed to use an appropriate control. Without a control group, it is impossible to determine what portion of the response is attributed to respondents' preexisting beliefs or background noise. Berger & Halligan, Ex. 7, at 26; *and see* Diamond, Ex. 4, at 397. Courts have held that failure to use an appropriate control warrants exclusion of the survey. *See THOIP v. Walt Disney Co.,* 690 F.Supp.2d 218, 241 (S.D.N.Y. 2010); *and see Vista Food*, 2005 WL 2371958, at *6 (excluding Berger survey based, in part, on failure to use a control). The Berger Report did not include <u>any</u> discussion of a control group or control questions. Later, during deposition, Berger testified that Survey 4 served as his control. But the Berger Report contains absolutely no comparative analysis of Survey 4 to Surveys 1, 2 and 3. We have no way of knowing whether his respondents' opinions were formed based on the opening paragraphs they were provided and the questions they were asked, or the result of information or misinformation from sources other than the stimulus and questions. Notably, the survey itself suggests that a ***significant*** portion of respondents answered questions based on information <u>other</u> than the stimulus. Specifically, Survey 3, which was provided to respondents who had previously purchased Halodrol MT, contained a stimulus that did

### C. Berger's Analysis is Woefully Deficient, and His Conclusions are Unsupported

Expert testimony must assist the trier of fact, through application of scientific expertise, to understand the evidence or determine a fact in issue. *See Daubert*, 509 U.S. at 589; *and see Native Am. Arts,* 2012 WL 1833877 at *5 (excluding Berger's conclusion because instead of assist the jury, it simply told the jury what conclusion to reach).[18] An expert's conclusions must be based on an analysis of the underlying data. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (a court need not admit an expert opinion that is connected to the underlying data "only by the *ipse dixit* of the expert"). The Ninth Circuit has excluded survey evidence where the survey results provided "at best, marginal support for the expert's opinions." *Lanphere Enters., Inc. v. Jiffy Lube Int'l, Inc.*, 138 Fed. Appx. 20 (2005) ("the report was inadmissible because there was too great an analytical gap between its conclusions and the underlying data").

Here, Berger simply concludes:

> Clearly, users of testosterone boosting supplements are very careful and mindful of the products they use. They want to be make sure the products they use are: safe, legal, in compliance with U.S. regulations, contain 'NATURAL' ingredients, and deliver ingredients in the proper potency.
>
> Furthermore, an extremely high percentage of respondents that had previously taken one of the Gaspari Nutrition, Inc. products at issue in tnis [sic] lawsuit indicated they were informed that Gaspari Nutrition, Inc.'s advertising was false they [sic] would stop using the product and seek out another product in the same product line with

---

not mention Halodrol MT at all. The first question asked respondents: "Where [sic] you aware of this report of the of the [sic] potential side effects of Haladrol MT [sic]?" Fifty-five percent of the respondents responded "yes," indicating that they were aware of this advertising relating to Halodrol MT. Clearly, this response does not reflect a close and careful reading of the stimulus. Instead, <u>it reflects a significant amount of background noise, and serves as evidence that the survey is unreliable</u>. *See, e.g., Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 2009 WL 1082175, *8 (N. D. Cal. April 22, 2009) (discounting survey's conclusions because survey did not reliably account for noise).

[18] Here, Berger testified that his report does not contain analysis because a layperson could review the raw data and reach the same conclusion he did. Berger Depo, Ex. 6, 228:9-21.

advertised benefits.

Berger Report, Ex. 1, at 10.  ***Nowhere*** in his report does Berger tie these conclusions to the data he gathered through survey research.  As a result, his conclusions that users are "very careful and mindful" and "want to make sure…" are meaningless in the context of this case.[19]  Moreover, it appears that Berger has drawn these conclusions with regard to *all* users of testosterone boosting supplements – a conclusion neither his survey structure nor his raw data support.[20]  Finally, Berger's survey tested statements made on a government website.  During deposition he admitted that he can't reasonably extrapolate these results to statements made by a product's manufacturer in advertising or on a label.  Berger Depo, Ex. 6, 85:13-87:18.  Here, the analytical gap between the conclusions and the underlying data is so significant even Berger can't bridge it.  Given the complete absence of analysis in his report, one can conclude that Berger would draw these same conclusions, regardless of his survey's results.

## IV.     CONCLUSION

Many sources have noted the difficulty associated with creating the perfect survey.  McCarthy at §32:170.  Thus, many courts have held that "technical deficiencies" go to the weight of the survey and not its admissibility.  *Click Billiards*, 251 F.3d at 1263.  But the flaws in the Berger Survey far exceed what can be classified as "technical deficiencies."  This survey is an intentional effort to generate evidence favorable to one party, while expressly disregarding the widely accepted principles underlying survey research.  Berger has asked biased, leading and prejudicial questions to a respondent panel he suspects may be bogus, and drawn broad sweeping conclusions that are entirely unsupported by the data he gathered.  The Berger Survey, and the conclusions set forth in the Berger Report are unreliable.  The only appropriate action is exclusion.

---

[19] During deposition Berger could not provide a reasonable basis for either of these statements.  Berger Depo, Ex. 6, 189:14-202:5.

[20] Berger did not survey users of testosterone boosting supplements.  Instead, he sought to survey only past GNI customers.  Further, the responses to his questions do not indicate that all respondents would behave in the same way.

DATED this 19th day of August, 2013.

                                            GALLAGHER & KENNEDY, P.A.

                                            By: */s/ Robert J. Itri*
                                                Robert J. Itri
                                                Andrea L. Stone

                                            LELAND, PARACHINI, STEINBERG,
                                            MATZGER & MELNICK, LLP
                                            Gregory M. Krakau

                                            MITCHELL STEIN CAREY, P.C.
                                            Flynn P. Carey

                                            *Attorneys for Defendant/Counterclaimant*

**CERTIFICATE OF SERVICE**

      I certify that on August 19, 2013, I electronically transmitted the foregoing to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following:

      Geoffrey S. Kercsmar, Esq.
      Gregory B. Collins, Esq.
      Molly Eskay, Esq.
      KERCSMAR & FELTUS PLLC
      6263 North Scottsdale Road, Suite 320
      Scottsdale, Arizona 85250
      *Attorneys for Plaintiff/ Counterdefendant*

/s/ Jeanette Burkey